309 So.2d 167 (1975)
Ernest BOLTON
v.
CATALYTIC CONSTRUCTION COMPANY and Hartford Accident & Indemnity Company.
No. 47661.
Supreme Court of Mississippi.
March 3, 1975.
Rehearing Denied March 24, 1975.
Pyles, Tucker & Cupit, Jackson, for appellant.
Daniel, Coker, Horton, Bell & Dukes, Richard L. Carlisle, Jackson, for appellee.
SUGG, Justice:
This is an appeal from an order of the Circuit Court of Warren County affirming an order of the Workmen's Compensation Commission.
The attorney referee found that the claimant, Ernest Bolton, sustained an injury to his back in the course of his employment *168 on August 21, 1969 which aggravated a preexisting congenital back condition. He allowed temporary total disability from August 21, 1969 to September 11, 1969 and also for any days actually missed from work between September 11, 1969 and October 24, 1969 for which claimant was not paid his regular salary by his employer, Catalytic Construction Company. He found that claimant terminated his employment on October 24, 1969 and reached maximum medical recovery on October 27, 1969.
The order of the attorney referee was approved by the Workmen's Compensation Commission and affirmed by the Circuit Court of Warren County. Claimant filed 15 assignments of error in which he contends that the judgment is not supported by substantial evidence and is against the overwhelming weight of the evidence, that the award should not have been limited to compensation for temporary total disability, that the lower tribunals erred in failing to take into consideration the undisputed fact that the claimant worked for many years performing heavy manual labor without any difficulty or disability connected with his back until the injury of August 21, 1969, and that the injury of August 21, 1969, was the sole cause of claimant's inability to perform any work requiring heavy manual labor, bending, stooping or lifting.
Claimant filed his application for workmen's compensation benefits on January 26, 1970, and the first hearing was held in Vicksburg on April 17, 1970. The hearing was recessed for further testimony to be taken in Jackson upon notice to the parties. On August 20, 1970, claimant filed a motion for a hearing under General Rule 9 of the Rules and Regulations of the Workmen's Compensation Commission and moved for a determination of whether it would be to the best interest of the claimant to have medical care other than that offered by the employer and carrier, and for an order providing for treatment required by the injury at the expense of the employer and carrier. Additional testimony was taken on February 23, 1972, on complainant's motion under General Rule 9 with the stipulation that the testimony of the witness, Dr. O.J. Andy, would not be limited to the motion. After Dr. Andy testified the hearing was recessed and reopened on July 19, 1972 for the purpose of introducing the medical report of Dr. James W. Allison dated May 17, 1971.
At the first hearing on April 17, 1970, Dr. James W. Allison and the claimant testified.
The evidence showed that claimant was born April 28, 1910, and was 59 years old at the time of his injury. He had a sixth grade education and before being employed by Catalytic Construction Co., worked as an upholsterer, tile layer and installer of wall board. His work as an upholsterer included refinishing and repairing furniture, and this work, together with his work installing wall board, entailed stooping, lifting, turning, twisting and bending. His work laying tile required that he work on his knees most of the time. Claimant testified that he experienced no difficulty with his back while engaged in his former vocations and that his first back trouble dated from his injury of August 21, 1969.
On August 21, 1969, claimant was cleaning out a storeroom with two other men, and they attempted to move some scales which weighed between 400 and 450 pounds. When he lifted the scales to load them on a truck, he felt a sharp pain in his back and experienced pain the following night to the extent that it awakened him. He reported for work the next day but because of the severe pain in his back, reported his condition to the foreman and related how he had injured his back. His employer sent him to Dr. Allison who treated him sixteen times between August 25, 1969 and January 5, 1970.
Claimant returned to work on September 11, 1969, and worked irregularly through October 24, 1969. He testified that at first, he was given light work as recommended by Dr. Allison, but his duties were *169 changed, and he was required to load scrap iron at which time his pain recurred. He lost approximately 15 days from work between September 11th and October 24, 1969, and said that he had not been able to work since October 24th on account of his back. He further testified that he tried to do some chores around the house but could not perform them. He last saw Dr. Allison on February 25, 1970, and stated that Dr. Allison told him that his employer would not pay for any more treatment. On that date Dr. Allison gave him a prescription which claimant paid for himself.
It was Dr. Allison's opinion that the claimant was not able to do heavy manual labor at all, and had he been called on to give claimant a pre-employment physical examination, he would not have passed him for any job requiring heavy manual labor. In Dr. Allison's opinion, the only work claimant could do would be work that would require little stooping, lifting or bending. Dr. Allison testified that, based on a report from Dr. Moore, claimant had an extra lumbar vertebra with transverse processes off the vertebra that caused claimant to be extremely vulnerable to back injury.
Dr. Allison referred claimant to Dr. J.M. Moore, an orthopedic surgeon, who examined claimant on October 7, 1969. Dr. Moore's findings are set forth in his letter of October 8, 1969 to Dr. Allison as follows:
Orthopedically he is a poor risk for lifting and stooping activities, his present height being seventy five inches. He has six lumbar vertebrae instead of five as a partial accounting for the undue height. This extralumbar vertebra has transverse processes which tend to impinge on each ilium with consequent difficulties on the part of this man to rotate his trunk when the legs are fixed as in a standing position. He seems to be rather tender over these anomalous articulations but he is quite negative toward the usual signs and tests for nerve root irritation as in ruptured disc cases. His reflexes are normal and he has no alteration in sensation. He tolerates straight leg raising beautifully but he will not permit heel to knee test, a downward thrust on the cross knee invariably promoting pain exactly at the point of the false articulation.
This man might be subject to chronic low back pain with or without congenital anomaly, simply by reason of his height. Mercer's Text Book of Orthopedics states that the coal mines and iron mill in Scotland will not hire a worker whose height exceeds sixty eight inches. At any rate, this man may not be quite correct in his statements that he never had any back difficulties before. I think his proper diagnosis would be an exacerbation of the effects of the congenital anomaly at the lower back. The treatment rendered would be that of the application of a corset to inhibit rotary motions and the use of some anti-inflammatory agent such as Indocin. Naturally, any local measures such as heat and liniments are appreciated by patients. I think he should return to that limited duty status as soon as possible to avert a claim for lifetime disability. His period of usefulness at stooping and lifting will not be possible over any lengthy period and this is a good case for reassignment of duties. So far as surgery and so-called cures be concerned, I doubt if orthopedics has an answer for the problem other than adaptation of activity according to the physical limitations present. But we are all aware of the fact that these patients will deny any previous difficulty whatsoever and will always blame any degenerative signs during the fifth and sixth decades of life on some alleged mishap at duty, whether or not an accident in the true sense of the word did ensue.
Dr. Allison stated that he personally felt that claimant had trouble with his back before the accident and that claimant's back was beginning to bother him with the result that claimant felt he was disabled. He *170 stated that because of a change in attitude of claimant, claimant felt he was not going to be able to work anymore.
While the claim was pending, Dr. Allison saw claimant on April 26, 1971, and in his letter of May 17, 1971, related that claimant told him he had tried cutting lawns, trimming hedge and raking leaves but found he was unable to do this kind of work. Dr. Allison also reported that claimant said he had tried his previous vocation of upholstering but was unable to do this as well as before, that covering a chair which normally required three hours, now required as long as three days to complete. He also stated that claimant described a different type pain from that reported during previous visits. He obtained X rays of the lumbosacral spine and included the following report from a radiologist in his letter:
"Examination of the lumbosacral spine shows a congenital anomaly of the first sacral segment with large transverse processes that articulate with the rest of the sacrum by pseudoarthrosis. There is considerable residual Pantopaque in the thecal canal from a previous myelogram. The normal lordotic curvature of the spine is present. The psoas shadows are symmetrical. There is only minimal ostheoarthritic changes of the lumbosacral spine. Impression: Pantopaque in the thecal canal and a congenital anomaly of the first sacral segment."
Dr. Allison concluded his summary as follows:
Results of my repeated examination at this time lead me to again conclude that this patient has a congenital anomaly at the top of the sacrum, and that this condition combined with his age make him a poor risk for any activities involving bending, stooping and lifting. Clinically, he does not demonstrate any findings that would indicate to me that he has nerve root pressure or so-called ruptured intervertebral disc syndrome. He has in time developed an unusual pain that radiates from his low back upwards into the shoulder and side of the head. This, I would tend to evaluate as probably a manifestation of emotional overlay, but at any rate, I was totally unable to demonstrate this pain during my examination.
The hearing on February 23, 1972 consisted of direct and cross examinations of Dr. O.J. Andy. Dr. Andy saw the patient nine times beginning August 3, 1970 and ending January 24, 1972. On August 6, 1970 a lumbar myelogram was performed on claimant, and in Dr. Andy's opinion, a defect existed at the fourth lumbar level, but he was not certain that the defect was enough to account for the patient's symptomatology. He was of the opinion that in order to determine whether or not the patient had a ruptured lumbar disc, a discogram should be performed. It was his opinion that the patient most likely had a ruptured disc but not of such gravity that it would require operative procedure. Since claimant had apparently done fairly well on conservative therapy, Dr. Andy stated that he would be inclined to continue with conservative therapy and progressively increase the activity of claimant. It was his recommendation, from a medical standpoint, that claimant be continued under conservative therapy and observation for a period of time before subjecting him to a discogram. It was his opinion that at the time he last treated claimant, claimant was not able to perform heavy manual labor and that he would encourage claimant to start with light duties with a view of working up to heavy labor within a three to six month period. It was his opinion that if claimant did not have a ruptured disc, he should be able to reach the point of resuming heavy labor within six months. He also stated if claimant had a ruptured disc, claimant would have trouble, and at that point, he would recommend further diagnostic studies which would include a discogram. If a ruptured disc were discovered, he would advise surgical excision.
*171 On cross examination the following questions and answers appear:
Q. Doctor, in your answers to questions on direct examination, you indicated that your recommendation with respect to further studies or treatment would be influenced to a large extent by the legal implications of this matter. Am I correct in my understanding of your 
A. No. I said if I were allowed to handle the patient from purely a medical standpoint that  and were not influenced by the legal aspects of the patient and the patient were not influenced by the legal aspects, I would treat the patient in one manner, but if the patient states, "I want to have a discogram in order to settle my legal difficulties", then I would go ahead and meet with his wishes, because I think it would be justifiable.
Q. So, Doctor, it would make a difference as to whether this was a private patient or an industrial patient as to whether or not you would do a discogram, is that right?
A. Oh, no. Not at all. I'm just saying that I would take a different course of approach in the treatment of the patient. Let me say that the patient has an obvious illness. The question is whether or not he does have or does not have a ruptured disc. In my opinion I think that he probably has. Now; however, he has done quite well on conservative therapy and, if he does not have a ruptured disc, then the patient should be continued on conservative therapy and be progressively increased in his activities to the point that he was before the injury, without doing a discogram before that time. Because if he were not to have a ruptured disc, the discogram would be useless or would be a torture that the patient need not go through and a waste of time and everything else. Now, if the patient does not want to wait the three or six months or go through this type of thing or has a  some other reason or has a legal reason in that he wants to settle a claim, if he has a claim, and says, "I want to know whether or not I do or don't have a ruptured disc in my back and I want to go ahead and have a discogram done." Then I would say that there is justification there for going ahead and doing this study to definitely determine whether or not it is or is not ruptured without having to wait the three to six months, which I would do if he were not pushed by his legal 
Q. Doctor, what clinical evidences do you have of a ruptured disc, Doctor?
A. The main clinical evidence is the history and the persistent tenderness in his back.
Dr. Andy's recommendation that claimant be treated by conservative therapy with a return to limited duty status to be followed with a gradual increase of activities is in accord with the recommendation of both Dr. Allison and Dr. Moore. Dr. Allison attributed some of the pains described by claimant as a manifestation of emotional overlay. It was against this background of evidence that the attorney referee found as a fact that claimant reached maximum medical recovery on October 27, 1969. The only testimony fixing this date was that of Dr. Allison who previously stated in a letter dated October 31, 1969, the following: "I feel that the medical benefits have been definitely limited in this particular case and are probably approaching maximum benefit in termination."
The conclusion of Doctors Allison and Moore that claimant was disabled in a medical sense before his injury from performing heavy manual labor requiring bending, stooping and lifting because of the presence of a sixth lumbar vertebra *172 does not alter the undisputed fact that, functionally, claimant performed heavy manual labor effectively and with no discomfort before his injury in 1969. He earned wages and engaged in the strenuous exertions required by his various vocations, all without any discomfort or apparent disability. Claimant was fully able to perform his normal duties until the time of the accident and was, at least, partially disabled to do so thereafter.
Appellees rely on the rule stated in Rathborne, Hair & Ridgeway Box Co. v. Green, 237 Miss. 588, 115 So.2d 674 (1959) as follows:
The rule in this State is that when a pre-existing disease or infirmity of an employee is aggravated, lighted up, or accelerated by a work-connected injury, or if the injury combines with the disease or infirmity to produce disability, the resulting disability is compensable. A corollary to the rule just stated is that when the effects of the injury have subsided, and the injury no longer combines with the disease or infirmity to produce disability, any subsequent disability attributable solely to the disease or infirmity is not compensable. (237 Miss. at 594, 115 So.2d at 676).
Appellees argue that the evidence shows that the effect of the injury to appellant subsided and that his present disability is attributable solely to the congenital anomaly present in his back and is not compensable.
In M.T. Reed Construction Co. v. Garrett, 249 Miss. 892, 164 So.2d 476 (1964), this Court recognized a distinction between medical and functional disability.
It is without question that appellant was able to perform heavy labor involving twisting, bending and stooping up to the date of his injury in spite of the congenital anomaly which consisted of an extra lumbar vertebra.
Where one enjoys functional ability to perform his work in spite of an existing congenital defect and suffers an injury which aggravates the existing congenital defect, thereafter causing a loss of his functional ability, then as long as the functional loss continues the corollary to the Rathborne rule will not apply as a bar to compensation. Simply stated, when an injury causes loss of functional ability, it is compensable.
We therefore reverse and remand to the Workmen's Compensation Commission for a determination of benefits allowable to appellant for the extent and duration of his disability.
Reversed and remanded.
All Justices concur except GILLESPIE, C.J., and SMITH and ROBERTSON, JJ., who dissent.