374 So.2d 766 (1979)
Sam AZWELL
v.
FRANKLIN ASSOCIATES and American Motorists Insurance Company.
No. 51321.
Supreme Court of Mississippi.
August 1, 1979.
Rehearing Denied September 26, 1979.
Riddick & Carpenter, Robert M. Carpenter, Jackson, for appellant.
Butler, Snow, O'Mara, Stevens & Cannada, Dan M. McCullen, Jackson, for appellees.
Before SMITH, LEE and BOWLING, JJ.
BOWLING, Justice, for the Court:
This appeal involves benefits under the Mississippi Workmen's Compensation statutes. *767 The claimant, Sam Azwell, has appealed from the final order of the Commission and the Circuit Court of Adams County. A cross-appeal has been filed by Franklin Associates, employer, and American Motorists Insurance Company, carrier. The questions involved in the appeal are as follows:
1. Whether or not the claimant had reached maximum recovery at the time of the last hearing by the administrative judge, and, if so, the date that condition started;
2. Whether or not the employer and carrier are liable for penalties for stopping compensation benefit payments;
3. Whether or not the apportionment statute applies, and, if so, the extent, and
4. The proper average weekly wage upon which compensation benefits should be based.
The claimant, Sam Azwell, had been an insurance adjuster for many years. He was fifty-one years of age at the time of the initial hearing on July 12, 1974, and for twenty-one years had specialized in the field of adjusting fire and extended coverage losses for insurance companies. Admittedly appellant received a back injury on May 8, 1973, while inspecting the roof of a house in connection with the adjustment of a claim. The injury resulted in an operation on July 26, 1973, at which time Dr. Thomas C. Turner, a prominent orthopedic surgeon of Jackson, found and removed a protruded L-4 intervertebral disc. Appellant returned to part time work on October 26, 1973, but he remained under the care of Dr. Turner continuously from that date until at least the date of the final hearing as shown by the record, which was October 27, 1976.
The first question involved, as stated above, is the time temporary partial disability stopped and permanent partial disability started, and involves rather complicated situations and evidence as shown in the record. The first hearing was had before the administrative judge on July 12, 1974, at which time testimony was taken from the claimant Azwell, Mr. Lawrence Franklin, owner of the employer-company, a rather large adjusting firm, and Mrs. Patricia Azwell, wife of claimant. The hearing was continued to August 20, 1974, at which time testimony and evidence was received from Dr. Thomas C. Turner and Dr. Richard Tyer, a chiropractor. As a result of this hearing the administrative judge issued his order dated September 17, 1974. He repeated Dr. Turner's diagnosis post-operatively to the effect that a partial laminectomy was performed at the L-4 and L-5 level, with the nerve roots found to be inflamed, and also found a bulging disc with a moderate amount of degenerative disc material.
The material findings of the administrative judge by his order in connection with the question now discussed were that Dr. Turner stated that claimant's condition was "stable but that he had not reached maximum medical recovery ..."; a finding that "claimant was temporarily totally disabled from July 23, 1973, until he returned to work in October, 1973, and has been temporarily partially disabled ever since." The administrative judge made a positive finding that claimant "had not reached maximum medical improvement" and ordered that temporary partial disability be paid the claimant "until the claimant shall have reached maximum medical improvement and his permanent disability shall have been evaluated and adjudicated." [Emphasis supplied]. There was no appeal from these findings by either the claimant, the employer, or the carrier.
The carrier made temporary partial payments of compensation until May 26, 1976, when it notified claimant that all payments were being discontinued. On that date, the carrier filed with the Commission what was styled a "Motion to Controvert," in which it contended that temporary partial payments should have been discontinued on January 30, 1974, approximately two and one-half years prior to the time the payments were stopped.
A hearing was had before the administrative judge on October 27, 1976, at which *768 time further testimony was received from Dr. Turner, and additional testimony from the claimant Azwell and Elsworth A. Forrester, the president of employer. The hearing was concluded in one day but for some reason not shown in the record an order was not entered on the hearing by the administrative judge until August 8, 1977. In that order he found retrospectively that the claimant had received maximum medical improvement on July 17, 1974, and ordered that payments made after that date by the carrier be adjusted accordingly. He found that the employer and carrier were liable for statutory penalties as provided by section 13(e) of the Compensation Act from the date the payments were stopped [May 26, 1976]. Claimant petitioned for a full commission review of the administrative judge's order, and a cross-petition for appeal was filed by the employer and carrier.
On January 31, 1978, the full Commission entered its order affirming the action of the administrative judge in retroactively determining that permanent partial benefits should have started on July 17, 1974. The Commission reversed the administrative judge's order on the finding of penalties and held that none were due. It also disagreed with the administrative judge on the re-evaluation of claimant's average weekly wage and placed a new evaluation thereon. On appeal to the Circuit Court of Adams County, the January 31, 1978, order of the Commission was affirmed and, as hereinbefore stated, all parties now appeal.
In determining the question of whether or not the administrative judge, the Commission, and the circuit court had substantial evidence to set the date of July 17, 1974, as the date claimant reached maximum medical recovery and, therefore, payments should have been changed from temporary partial to permanent partial requires an analysis of the main evidence and testimony directed toward this point.
The administrative judge clearly based his opinion on an answer to the judge's question at the end of the second round of Dr. Turner's testimony on October 27, 1976. After the doctor had been subjected to lengthy interrogation, the administrative judge stated,
In the off-record discussion, the question has been brought up by the hearing officer as to when maximum medical recovery was reached, and since neither of the lawyers has asked the question, I would like to ask the Doctor when maximum medical recovery has been reached in your opinion? ... I gave you gentlemen an opportunity to ask these questions and you didn't ask. So I am asking the doctor if and when. I will amend my question.
Dr. Turner answered: "I think I would say at the time I gave the summary on July 17, 1974. I don't think there has been any significant change since that time."
It is possible that Dr. Turner misunderstood the proceedings at that time and misunderstood the information the administrative judge was seeking, as all the evidence in the record clearly refutes his answer. It is necessary, therefore, to document the material parts of this evidence and the resulting finding by the administrative judge.
Going back to the first order of the administrative judge issued on September 17, 1974, after hearing extensive testimony from Dr. Turner on August 20, 1974, there was positive finding that after claimant returned to work in October, 1973, he "has been temporarily partially disabled ever since." He found that, as testified by Dr. Turner, claimant "had not reached maximum medical treatment." He further entered a positive order directing that the employer and carrier pay to the claimant temporary partial disability benefits until "his permanent disability shall have been evaluated and adjudicated." As hereinbefore stated, there was no appeal from this order.
A careful examination of the record reveals that the administrative judge's findings were a result of the testimony of Dr. Turner on August 20, 1974, almost a month after the contended for temporary partial disability ceased. On August 20, 1974, Dr. Turner was asked: "Doctor, has Mr. Azwell received maximum medical improvement at *769 this time?" His answer was: "He's reached a more or less stable condition, but not what I would consider maximum recovery from it." Upon being asked to explain, the doctor replied:
Well, he's still having symptoms, and I have  symptoms that persist to the degree that I would not be in favor of discharging him, but I would like to continue to observe him to see if this unstable condition will gradually quiet down and stop causing symptoms or whether we'll have to fuse his back.
At the October 27, 1976, hearing a letter was introduced from Dr. Turner to Kemper Insurance Company dated July 29, 1974, in which it was stated:
To summarize this man's condition, he has had protruded lumbar disc between the last removable lumbar vertebra which is L-4 and the transitional L-5 vertebra which at time of surgery did not appear to be unstable, but since then has been demonstrated by x-ray to exhibit some instability between these two vertebrae. This, in my opinion, would account for his prolonged pain. I have treated him conservatively with the hope that this would gradually improve, but his symptoms linger on and it is at least a 50-50 probability that he will require a spine fusion to get lasting relief from this problem. In the event that he does have a successful spine fusion, I would rate his back at about 15% to 20% permanent partial disability to the body as a whole, but in actuality his back would probably function better in that condition than at present and with a good fusion I would expect him to impose moderate stress on his back without difficulty. As he is at present, he will probably continue to require use of the brace and some medications and local treatment for a prolonged period of time.
At the same hearing, Dr. Turner testified as follows:
Q. Well, Doctor, what is your opinion whether there has been any further slippage of the L-4 on the transitional vertebra since March 13th, 1974?
A. Let me check just a moment here. I think he had probably gotten a little more  he had gotten a little more movement between those two vertebrae.
Q. What would that be due to?
A. The gradual settling of that disc space and the arthritic changes associated with that.
Q. What would the effect of continued work in doing his adjusting of fire and extended losses and that sort of thing have on it?
A. Well, I think stresses and strains would probably contribute to a gradual progression of it.
Dr. Turner, on October 27, 1976, testified that "it is becoming increasingly possible that a spine fusion will be necessary," and "he has what I consider an unstable joint between the last movable vertebra and the transitional vertebra." It is interesting to stop here and note that prior to the beginning of the October 27, 1976, hearing the administrative judge reiterated that claimant had not reached maximum medical recovery at the last hearing on August 20, 1974.
Several medical reports to the carrier were introduced in evidence in the October, 1976, hearing. A report dated October 24, 1974, a little over a month after the first hearing, stated:
The shot lasted almost three weeks. Five days ago he had mild pain and that was on Thursday, and the next day he got up feeling better and went to work on that Friday but had to stop working during the middle of the day, go home and rest. He got better and went back for an hour, and it recurred. He has had moderate pain over the weekend. He states that this seems to be the worst spell that he has had. He is still tender over the L-4-5 interspace and pain on movement with back pain but no sciatic stretch on straight leg raising to 70° bilaterally. It is becoming increasingly possible that a fusion will be necessary, but I decided to inject this area three times in a row at 2 1/2 week intervals with Xylocaine and Depo-Medrol. Then let it rest for a *770 while, and if he does not get any better I will recommend a fusion.
By letter dated February 3, 1975, Dr. Turner stated:
I last checked Mr. Azwell on the 16th day of January, and we discussed the possibility of surgery, but he states that he would like to put this off until at least this summer. I think there is at least a 75-25 probability that surgery will be necessary to relieve his symptoms.
By letter dated October 28, 1975, Dr. Turner wrote:
He had a flare-up of pain in his back about 3 weeks ago, but went home and stayed in bed for a day with muscle relaxers and medications and got relief. However, for the past two days he has had a flare-up and is tender in the interspace between the transitional and the lower vertebra with some pain on the extremes of movement, but no straight leg raising pain. He has also been having a little discomfort in the left knee lately. To palpation he has a cystic lateral cartilage that is unrelated to his back problem. I injected the interspinous area between the lower vertebra and the sacrum with Xylocaine and Depo-Medrol and will check him in about 6 weeks.
In a letter dated January 6, 1976, Dr. Turner reported:
Day before yesterday he developed a flare-up of an acute nature. He had to stay in bed most of the rest of that day and then all day yesterday. The pain extended down both thighs posteriorly as a dull deep pain. He is a little better today, but he has tenderness at the L-4-5 interspinous level and has pain on about 75% flexion extension. He has no real straight leg raising pain. I injected a small amount of Celestone and Xylocaine into the interspinous area between L-4 and 5 and got a definite back flow, indicating the probability of a bursa at this level. I did change him to Ponstel, Parafon-Forte and plain Tylenol for pain. He has been taking Darvon for a while. I would like to alter this and also try to stop the Valium and Soma. Recheck in about 2-3 months or sooner if he does not get relief from this injection.
By letter dated May 4, 1976, Dr. Turner stated:
Because of personal reasons he stated he could not consider a fusion at this time and upon review of his record, it appears that his condition has been relatively static. He is using his brace, at least part-time, and this does seem to help him. I gave him a disability rating of 15-20% permanent partial disability of the body as a whole on July 17, 1974, and I felt that a solid fusion at the lumbosacral joint level would actually improve the condition of his back. There has been nothing to change my estimate of his disability since that time and I believe that his condition has been relatively stationary since then.
The last report prior to the carrier stopping compensation payments on May 26, 1976, was dated May 17, 1976, and reads as follows:
He is having a flare-up of low back pain with some extension in the right buttock. It seems to have been aggravated this week by having to work on an extra long shift on some claims work. He complains of tenderness over L-4 to 5 interspinous ligaments and pain on about 50% movement of the back but no real sciatic stretch pain and no neurological impairment. I re-injected the tender area with Xylocaine and Celestone. I again discussed with him the desirability of a low back fusion. He states he cannot do that at the present time because of a combination of home problems and personnel shortage at the office. We probably will elect to go ahead in late summer or early fall.
By letter dated September 22, 1976, approximately one month before the last hearing, Dr. Turner reported as follows:
He came in today having increasing pain lately. He complains of tenderness across the low back area, particularly between the lower two spinous processes. He can carry out about 50% movement with pain on all movements. He is not *771 having any radicular pain. He has some pain in the right trochanteric area. I talked to him about stopping the Valium since I do not think that it is a good idea to continue to take this indefinitely and decided to switch him to Librium, taking no more than one a day. I did inject the interspinous ligament with Xylocaine today since it seems to give him some temporary interruption of his cycle before. I still believe that the primary treatment should be a fusion, but he is not ready to make a decision at this time.
From the foregoing discussion of the medical evidence, it is readily apparent that a retrospect finding that claimant reached maximum medical recovery on July 17, 1974, was not substantiated in the record.
In addition to the medical testimony, claimant testified that his ability to perform his activities was continuously decreasing and his income was decreasing proportionately. At the time of the October, 1976, hearing his situation had deteriorated so that he was performing from eighty to ninety percent of his work in the office by telephone.
We find that the administrative judge, the Commission and the circuit court were manifestly in error in retrospectively holding that the claimant reached maximum medical recovery on July 17, 1974, and the cause should be reversed for an evaluation of the claimant's condition now.
We find that the carrier erroneously discontinued payment of temporary partial disability on May 26, 1976. The record does not reflect justification for that action, particularly when considering the hereinbefore set out medical evidence, all of which was in the carrier's file. In addition to this, the carrier violated the unappealed order of the administrative judge of September 17, 1974, wherein he ordered the carrier to pay temporary partial disability benefits until maximum medical improvement and his permanent disability "shall have been evaluated and adjudicated." The administrative judge, in his order of August 8, 1977, was manifestly correct in finding that the employer and carrier were liable for statutory penalties for discontinuing and stopping compensation payments. The order of the full Commission and the circuit court is reversed on that issue and judgment rendered here with the amount of the penalties to be determined after remand.
As stated at the outset, another issue involved in the case at bar was whether or not the apportionment statute should be applied and a percentage deducted from the weekly payments because of a pre-existing physical handicap, disease or lesion, as provided for in section 4 of the Compensation Act [Mississippi Code Annotated section 71-3-7 (1972)]. The evidence showed that the claimant had been having "trouble" with his lower back for a number of years. He had been treated on occasions by a chiropractor. In November, 1972, he slipped in his yard and Dr. Turner placed him in traction for several days. The testimony of Dr. Turner was that he recovered from this episode. We then had the above related evidence pertaining to the accidental injury on the roof of the house on May 8, 1973.
Section 4 of the Workmen's Compensation Act provides that apportionment shall not be applied until the claimant has reached maximum medical recovery. Under our ruling hereinbefore set out, there has been no determination at this point as to the date of maximum medical recovery. It is, therefore, necessary to remand this issue along with the other issues for disposition at the time the proper date is determined.
In this connection, we call the attention of the administrative judge and the Commission to the cases regarding whether or not the apportionment statute applies to injuries to parts of the body that have become weakened because of normal aging processes. These cases include, but are not limited to, the following: Evans v. Continental Grain Company et al., 372 So.2d 265 (Miss. 1979); Riverside of Marks v. Russell, 324 So.2d 759 (Miss. 1976); and Weaver Pants Co. v. Duncan, 231 So.2d 489 (Miss. 1970); Bolton v. Catalytic Construction Co., 309 So.2d 167 (Miss. 1975).
*772 From a study of the record, the Court cannot hold that the Commission was manifestly wrong in determining claimant's average weekly wages, and we affirm that finding, subject, of course, to re-evaluation at any subsequent hearing. From the above findings, it follows that all cross-assignments of error are affirmed other than the assignment alleging error of the Commission by changing the average weekly wage.
It follows that the cause should be affirmed in part as to the findings of average weekly wage, and reversed and remanded on all other questions raised as set out in this opinion.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REMANDED.
PATTERSON, C.J., SMITH and ROBERTSON, P.J., and SUGG, WALKER, BROOM, LEE and COFER, JJ., concur.